IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:23-CV-00619-KDB-DCK

| | |
|---|---|
| NICHOLAS FRANCIS, | |
| **Plaintiff,** | |
| v. | **ORDER** |
| TOWN OF MINT HILL, CASSANDRA SCOTT, AND STEPHEN LANG, | |
| **Defendants.** | |

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment (Doc. No. 21). The Court has carefully considered this motion, the parties' briefs and exhibits and oral argument on the motion from the parties' counsel on April 17, 2025. For the reasons discussed below, the Court will **GRANT** the motion.

## I.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Modern Mosaic, LTD v. Turner Construction Co.*, *et al.*, 946 F.3d 201, 206 (4th Cir. 2019). A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *8.929 Acres of Land,* 36 F.4th at 252. "A fact is material if it might affect the outcome of the suit under the governing law." *Id*., (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

1

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (when the nonmoving party "has failed to make a sufficient showing on an essential element of [his] claim with respect to which [he] has the burden of proof," summary judgment is warranted); *United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 178 (4th Cir. 2022). If the movant satisfies his initial burden to demonstrate "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmovant to "present specific facts showing that there is a genuine issue for trial." *8.929 Acres of Land,* 36 F.4th at 252, quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). Rather, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, "citing to particular parts of the materials of record" and cannot rely only on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Fed. R. Civ. P. 56(c)(1)(A); *8.929 Acres of Land,* 36 F.4th at 252, (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)).

Still, summary judgment is not intended to be a substitute for a trial of the facts. *Anderson*, 477 U.S. at 249. In determining if summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted) (quoting *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017)). "Summary judgment cannot be granted merely

because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed. 1998)). In the end, the relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## II.     FACTS AND PROCEDURAL HISTORY

On October 24, 2020, Mint Hill, North Carolina police officers Cassandra Scott and Stephen Lang (collectively, the "Officers") arrested Plaintiff Nicholas Francis for driving while impaired, resisting arrest and other charges. In this action, Francis alleges that the officers violated federal and state law by unlawfully entering his residence to effect his arrest and using excessive force in doing so. *See* Doc. No. 1.

The parties generally agree on the first phase of the incident. At approximately 1:30 a.m., Officer Scott was on patrol in her marked black and white police SUV when she was made aware of a report that a drunk motorist was driving a white Mercedes to the Farmwood Estates subdivision within Mint Hill. Not long after, Scott saw a white Mercedes with a "Dealer" license plate pass her going in the opposite direction headed towards Farmwood Estates. Doc. 21-1 at 2 ("Scott Declaration"). Scott made a U-turn to follow the Mercedes, which, after tailgating another vehicle, turned into Farmwood Estates. Scott accelerated to catch up to the Mercedes, which itself accelerated "well over the 25-mph speed limit" after it turned into the neighborhood. *Id.*

At that point, Scott radioed that she intended to conduct a traffic stop and detain the driver to investigate the reported drunk driving. However, before she turned on the patrol vehicle's overhead blue lights and began to make the stop, the Mercedes quickly turned left onto the next

3

street and then into the second residential driveway, pulling forward all the way to an open garage. Scott followed the Mercedes into the driveway and stopped a short distance[1] behind it. She did not turn on her blue lights, but the driveway was lit by the headlights of Scott's patrol vehicle as well as a light pole near the garage. Scott's shift sergeant, Stephen Lang, heard the initial drunk driving alert, followed by Scott saying she was going to make a traffic stop. When Scott failed to complete her transmission about the stop, Lang became concerned and began driving to Farmwood Estates.

The parties describe the following events somewhat differently. Francis, who was driving the Mercedes, says that he left the vehicle then was "startled by sounds behind him" and began to run towards the door in the garage that led into the home's kitchen. He claims that he did not see Scott's marked police SUV. Scott says that she saw Francis exit the vehicle and then she told dispatch to "stand by" as she left her car to go towards Francis. In her haste, she did not manually engage her Body Worn Camera ("BWC"), which would have been on automatically if she had turned on the patrol vehicle's blue lights. Scott testified that she identified herself as the Police and told Francis to stop.[2] At his deposition, Francis denied hearing Scott say "Police" or tell him to stop, but after the arrest he told the officers on the scene that Scott had said "stop, stop, stop." *Compare* Doc. No. 27-3 ("Lang BWC") at 10:45 with Doc. No. 27-4 ("Francis Dep.") at 114 – 115.

There is no dispute that the two began fighting with each other when Francis continued towards the door. When Francis did not stop, Scott grabbed his arm to keep him from going into

---

[1] The parties respectively describe the distance as approximately "twenty feet" and "two to three car lengths."

[2] Plaintiff argues that this testimony is inconsistent with statements made at the scene, but this is incorrect. When she was asked after Francis' arrest if she had identified herself, she said that she had. *See* Lang BWC at 10:40. Also, soon after the arrest, both Francis and Scott said that Scott had told Francis to "stop." *Id*. at 10:45, 15:03.

4

the garage / house.[3] Despite Scott's determined efforts (she had blood underneath her fingernails from trying to hold on to Francis' forearm), Francis, a large man, was able to force Scott's hands off his forearm and pull Scott towards the door. During the fighting, Scott smelled a strong odor of alcohol on Francis. Scott then tried to stop Francis from going into the house by grabbing his shirt and belt, but, again, Francis was able to get to the door to the house by pulling Scott and trying to push her off of him. At the door, Francis pushed the mounted garage door control device, which caused the garage door to close, frightening Scott (who didn't notice that the garage was not fully enclosed). At some point during this struggle, Scott managed to grab the radio microphone clipped to her shoulder and shout, "I need additional units," but lost her grip on the microphone key because all that was heard was, "I need additional . . . ." *See* Lang BWC at 01:02; Scott Decl., ¶ 9.

Francis's wife, Majida Hasbini, came to the door leading into the house and opened it. Scott asked Hasbini for help, but she did nothing. Francis finally extricated himself from Scott by hitting her in the jaw with his elbow and then he fled inside the house. *See* Francis Dep., 52:16-53:11; Scott Decl., ¶ 11. Once inside the house, Francis ran through the kitchen before turning and disappearing from view, headed towards what Scott presumed was upstairs. Francis and his wife testified that Francis told his wife to "Call the police. Somebody's trying to rob me," to which his wife responded, "That is the police." *See* Doc. No. 27-6 ("Hasbini Dep.") at 36 – 37; Francis Dep. at 50. Hasbini further testified that the interior of the garage was well lit and that Scott was clearly recognizable as a police officer in full uniform. *See* Hasbini Dep. at 34, 37 and 40.

---

[3] The parties disagree about where Scott first reached Francis, with Scott saying that it was outside the garage and Francis saying that he was already in the garage when Scott first tried to restrain him. For the purpose of this Order, the Court has assumed that Scott and Francis' first physical encounter started in the garage.

Rather than immediately entering the house to again try to arrest Francis on her own, Scott decided to wait for the additional officers she had requested to arrive. Sergeant Lang soon made it to the house, and his BWC was activated.[4] *See* Lang BWC at 01:01. When Lang entered the garage, he asked, "Where's he at?" In response, Scott told Lang that, "I just fought him" and that, "[h]e took off upstairs." Lang BWC at 1:37-1:47. Less than two minutes after Francis went into the house, Lang and Scott entered the kitchen through an open door with their handguns drawn. *See* Lang BWC at 01:47; Scott Decl., ¶ 13; Doc. No. 21-5 ("Lang Decl."), ¶ 7.

Moving quickly into the kitchen, Lang asked Hasbini where Francis had gone. Hasbini said nothing and Lang and Scott climbed the stairs, with Hasbini following them. When they reached the landing, Lang continued to ask where was Francis and Hasbini pointed toward a closed bedroom door. *See* Lang BWC at 1:47-2:04. While Scott remained in the doorway, Lang, holstering his weapon, entered the bedroom and soon saw Francis, now shirtless, brushing his teeth with his left hand and his empty right hand by his side. *Id.* at 2:05-2:09. Within seconds, Lang grabbed Francis' hand and used an armbar maneuver to move him out of the bathroom and push him down onto the bedroom floor. *Id.* at 2:10-2:14. Lang testified that he wanted to avoid struggling with Francis in the bathroom because it was a confined area with lots of drawers that might have contained items that could be quickly grabbed and used against him, and the floor space itself was too narrow to accommodate a takedown. *See* Lang Decl., ¶ 10. Francis' nose struck

---

[4] Where there is law enforcement video that, "quite clearly contradicts the version of the story told by [a party]," the court can rely on that evidence to establish material facts at summary judgment. *Scott v. Harris*, 530 U.S. 372, 380 (2007). Also, even when, as here, a video shows only part of an incident, "[t]o the extent the video depicts material facts of this case, we review those facts as they are depicted in the video." *Hupp v. Cook*, 931 F.3d 307, 315, n.3 (4th Cir. 2019).

6

the hardwood floor straight-on and immediately began bleeding. Lang BWC at 2:15.[5] Lang then tried to handcuff Francis. After fastening the first cuff around Francis' left wrist (which unknown to Lang had previously been fractured in 2019), Lang went to pull the right wrist behind Francis' back, which was more difficult. *See* Lang BWC at 2:16-2:25. Ultimately, it took almost thirty seconds to get the right wrist cuffed, during which time Lang repeatedly told Francis, "Give me your hand!" Lang BWC at 02:26-02:57. Scott's only application of force inside the house was to place an open hand on Francis' back to restrict his movement while he appeared to be struggling against being handcuffed. *See* Lang BWC at 2:47-2:53.

After being assisted to his feet, Francis was walked out of the house and into the driveway where Lang applied a bandage to Francis' nose and arranged for EMS to provide Francis with further medical treatment at the scene. While waiting for arrival of Fire and EMS, Lang also repositioned the handcuffs to Francis' front to make them more comfortable. Lang BWC 6:30-7:24. When Lang asked Francis why he fought Scott, Francis said she "followed" him without her blue light on, so "How did I know it's the police people?" *Id*. at 10:40. Francis then admitted Scott grabbed him and—while pulling on him—ordered him to stop at least three times. ("She pull me, 'Stop stop stop!'"). *Id*. at 10:45.

Scott obtained a search warrant from a Magistrate to draw blood from Francis and drove to the hospital, where hospital staff drew the blood and gave her the sample for analysis. The State Crime Lab determined that at the time of testing Francis had a blood alcohol level of .17, which was more than twice the limit for DWI. *See* Scott Decl., ¶ 17. Scott charged Francis with DWI,

---

[5] Lang testifies that he had successfully applied the same armbar maneuver over ten times in actual arrest scenarios—both civilian and military—without apparent or reported injury, as well as dozens of times during training exercises without injury. Further, Lang testifies that he has never seen an armbar cause injury in any other arrest scenario where he has been present. (Lang Decl., ¶ 12).

7

resisting arrest, assault on a government official, and false imprisonment. She also issued him a traffic citation for unlawful use of a dealer tag on his Mercedes. According to the Complaint, "[a]ll criminal charges instituted against Francis were dismissed by the Mecklenburg County District Attorney." Doc. 1, ¶ 79.

Francis filed this action on September 29, 2023, Doc. No. 1, asserting four causes of action: 1) a Section 1983 claim against Scott and Lang in their individual capacities for allegedly illegally entering Francis' house without a warrant, and for using excessive force; 2) A North Carolina state law claim for negligence against both officers in their official capacities and against the Town of Mint Hill on the basis of respondeat superior; 3) a state law claim for assault and battery against both officers in their individual capacities; and 4) a state law claim for trespass to realty against both officers in their individual capacities. The officers and Town of Mint Hill answered the Complaint, arguing that all of Plaintiff's claims should be foreclosed on the merits and on the bases of qualified immunity and public official immunity. Defendants filed their Motion for Summary Judgment on January 31, 2025. Doc. No. 21. Plaintiff has responded, and the parties' counsel have had an opportunity to present oral argument on the motion. The motion is now ripe for the Court's ruling.

### III.     DISCUSSION

While Plaintiff asserts numerous claims as listed above, the core of the legal dispute before the Court is whether a jury could reasonably find in favor of Plaintiff on his claim that the Officers entered his residence unlawfully and used unconstitutionally "excessive" force in making his arrest. If so, then some of Plaintiff's claims might survive summary judgment. If not, then Defendants are entitled to summary judgment on each of Plaintiff's claims. Thus, the Court will focus its attention on Plaintiff's lone federal claim under Section 1983 then address more briefly

Plaintiff's state law claims, all of which also depend on a finding that the officers acted wrongfully in going into Mr. Francis' house and/or arresting him.

First, it is important to note that standard summary judgment rules apply to claims of excessive force against police officers. *See Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022). That is, "the Court must determine whether any material facts are genuinely disputed, i.e., is the evidence offered such that a reasonable jury might return a verdict for the non-movant." *See Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021); *Craven v. Novelli*, 661 F. Supp. 3d 430, 442 (W.D.N.C. 2023), *aff'd*, No. 23-1393, 2024 WL 1952590 (4th Cir. May 3, 2024). The Court ought not "overvalue the narrative testimony of an officer and [] undervalue potentially contradictory" evidence or be "especially critical of officer testimony in these cases." *See Stanton*, 25 F.4th at 234. Rather, the Court "need only apply ... normal summary-judgment rules, which ask whether reasonable juries might disagree over some material factual dispute." *Id.*; *see Heavner v. Burns*, No. 521CV00159KDBDCK, 2022 WL 17477561, at *3–4 (W.D.N.C. Dec. 6, 2022).

## A. Section 1983 Claims

Plaintiff's only claim under federal law is his First Cause of Action, which alleges that the Officers, who are sued in their individual capacities, violated 42 U.S.C. § 1983. While not a source of substantive rights, Section 1983 provides a vehicle to vindicate violations of rights, privileges, or immunities secured by the Constitution and laws of the United States. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). The statute provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

9

42 U.S.C. § 1983.

Thus, a case filed under 42 USC § 1983 provides potential remedial relief for a plaintiff who can prove that a person acting under color of state law deprived him of a right secured by federal law, including violations of federal constitutional rights, as well as certain limited federal statutory rights. *See Maine v. Thiboutot*, 448 U.S. 1 (1980); *Knibbs v. Momphard*, 30 F.4th 200, 214 (4th Cir. 2022); *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 580 (4th Cir. 2017). However, qualified immunity "shields Government officials 'from liability for [Section 1983] civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009). To overcome this immunity, Francis must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Jones v. Solomon*, 90 F.4th 198, 207 (4th Cir. 2024) (citing *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019)); *Bailey v. Campbell*, No. 522CV00052KDBSCR, 2024 WL 482211, at *2–3 (W.D.N.C. Feb. 7, 2024). The Defendants are "entitled to qualified immunity if either prong is not satisfied." *Id.*

Here, Francis alleges that the Officers violated the Fourth Amendment when they made an allegedly "unlawful entry" into his home and used "excessive force" in making his arrest. So, the Court must decide whether the officers committed a constitutional violation and also if the officers are nevertheless entitled to qualified immunity from liability for their conduct. "Said differently, the court must decide, under the nonmovant's version of the facts, the purely legal issue of whether a constitutional violation has occurred." *Craven v. Novelli*, No. 23-1393, 2024 WL 1952590, at *7 (4th Cir. May 3, 2024) (quoting *Armstrong v. Hutcheson*, 80 F.4th 508, 514 (4th Cir. 2023)). These questions are discussed below with respect to each of the Plaintiff's claims.

### 1. Alleged Unlawful Entry in Violation of the Fourth Amendment

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Thus, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Lange v. California*, 594 U.S. 295, 301–02 (2021), citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Generally, a judicial warrant is required before the police can enter a home without permission, but there are circumstances in which a warrantless entry is lawful, including an "important exception [] for exigent circumstances." *Id*. The exception enables law enforcement officers to handle "emergenc[ies]"—situations presenting a "compelling need for official action and no time to secure a warrant." *Riley v. California*, 573 U.S. 373, 402 (2014). As with the broader test under the Fourth Amendment, the ultimate test is whether a warrantless search is "objectively reasonable." *Kentucky v. King*, 563 U.S. 452, 460 (2011).

As explained in *Lange*, the Supreme Court has identified, without limitation, several such exigencies, including that an officer may enter a home without a warrant to render emergency assistance to an injured occupant, to protect an occupant from imminent injury, to ensure his own safety, to prevent the imminent destruction of evidence or to prevent a suspect's escape. *Lange*, 594 U.S. at 301–02 (internal citations omitted). "In those circumstances, the delay required to obtain a warrant would bring about 'some real immediate and serious consequences'—and so the absence of a warrant is excused." *Id*. (citing *Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984)). Also, it is a "long-settled rule" that pursuit of a fleeing felon is itself an exigent circumstance justifying warrantless entry into a home. *See Lange*, 594 U.S. at 315 (Kavanaugh, J., concurring); *United States v. Santana*, 427 U.S. 38, 42–43 (1976); *Stanton v. Sims*, 571 U.S. 3, 8–9 (2013) (*per curiam*).

11

No set of circumstances related to a misdemeanor suspect is "categorically" exigent. *Lange*, 594

U.S. at 313. Therefore, the decision as to whether the exigent-circumstances exception applies in

those cases must be determined on a "case-by-case basis."

    Here, viewing the facts in the light most favorable to the Plaintiff,[6] the Court finds that the

Officers' entry into Francis' home was "objectively reasonable" and thus did not violate the Fourth

Amendment. Based on what had been reported about the drunk driver in the white Mercedes and

what she observed herself (tailgating of another vehicle, speeding, etc.), Scott had probable cause[7]

to stop and arrest Francis, at least for speeding. Further, it cannot be credibly disputed that she was

in "hot pursuit" of Francis into his garage,[8] arriving to the driveway seconds after Francis pulled

---

[6] Plaintiff argues at length that there are several "factual disputes" between the parties' versions of events. While this is true (as described above), none of the factual disputes are material to whether, from the perspective of the Officers viewed objectively, their conduct was constitutional. For example, it does not matter whether or not Francis believed that he was fleeing from and then fighting with a police officer. Francis is not being charged with wrongdoing (except with respect to the counterclaim which is not before the Court in this motion), so whether or not his actions were "justified" is irrelevant. What is relevant is that an officer in Scott's position would have reasonably concluded from Francis' acknowledged conduct (i.e., there is no factual dispute that Francis fought with Scott) that there was probable cause to arrest him.

[7] Probable cause is an "objective" standard. "Probable cause exists when the facts and circumstances within an officer's knowledge – or of which he possesses reasonably trustworthy information – are sufficient in themselves to convince a person of reasonable caution that an offense has been or is being committed." *Watkins v. Arnold*, 214 F.3d 535, 539 (4th Cir. 2000); *State v. Johnson*, 599 F.3d 339, 346 (4th Cir. 2010). Probable cause must be "based upon a practical assessment of the totality of the circumstances." *United States v. Garcia*, 848 F.2d 58, 60 (4th Cir. 1988).

[8] Plaintiff argues that Scott's "pursuit" of Francis ended when Francis' wife allegedly shut the door into the kitchen after Francis had gone inside. Even ignoring the fact that the BWC clearly shows that Scott and Lang entered through a wide-open door, Lang BWC at 1:43-1:45, the Court declines to hold that Scott's pursuit of Francis ended when she prudently waited less than two minutes for a back-up officer to arrive. Beyond the very short time of the pause before further pursuing Francis, to hold otherwise could plainly endanger law enforcement officers acting alone, who would, if Plaintiff's position were accepted, be forced to choose between immediate pursuit at greater personal risk and having to stop the pursuit entirely to obtain a warrant. An officer ought not have to choose between their own safety and constitutional restraints. *See Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001) ("This Circuit has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action.").

in. Scott then chased Francis who was, by his own admission, at least hurrying (if not running)[9] towards the door in the garage that led into the house, where he could have retrieved a weapon or sought to destroy/limit evidence of his intoxication before Scott obtained a warrant.

Further, in those few seconds prior to going into the garage, Scott could not know whether or not it was Francis' house and whether the safety of those in the house might be at risk if he entered. Once Scott encountered Francis and he fought her and hit her in the face,[10] the Officers had further cause to pursue him into the home because assault on a police officer is a felony under North Carolina law. *See* N.C.G.S. § 14-34.7(c)(1) (making it a Class H felony to inflict any "physical injury" to an officer who is attempting to discharge his/her official duties); *State v. McLean*, 295 N.C. App. 254, 261 (2024) ("The 'physical injury' element [of N.C.G.S. § 14-34.7(c)(1)] was sufficiently satisfied when Defendant struck Sergeant Lackey in the face, despite the number of times or the severity of the injuries sustained."). Therefore, sufficient "objectively reasonable" exigent circumstances existed for Scott and Lang to enter Francis' house[11] to arrest him.

Also, even if the Officers' entry into Francis' house was found to violate the Fourth Amendment (contrary to the Court's finding), the Officers would have qualified immunity against

---

[9] Francis testified, "I got out of my Mercedes I'm coming to come home. I heard a noise behind me. I *run* to my door, my kitchen door. I tried to open it. I see that somebody come and pick me up from my shirt from the back to push me out." Doc. 27-4; 50:11-15 (emphasis added).

[10] While Scott testified that she first encountered Francis in the driveway outside the garage then was dragged towards the door as she grappled with Francis (which is corroborated by blood under her fingernails as she tried to restrain Francis by his forearm before she grabbed his shirt), the Court will, for purposes of summary judgment, accept as true Francis' testimony that Scott first held him by his shirt near the door leading into the house.

[11] For purposes of the Fourth Amendment analysis, the Court has assumed, as argued by Plaintiff, that the garage attached to the main portion of Plaintiff's residence is part of his home. *See United States v. Walton*, 56 F.3d 551, 553 (4th Cir. 1995); *Lange*, 594 U.S. 295 (evaluating a police officer's warrantless entry into a defendant's garage under the Fourth Amendment).

13

Plaintiff's claims because it was not "clearly established" that their conduct was unlawful. Qualified immunity protects officials "who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). The doctrine balances two important values—"the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The Fourth Circuit has stated:

> The basic rules of § 1983 [qualified] immunity are well known. Underlying the doctrine is a desire to avoid overdeterrence of energetic law enforcement by subjecting governmental actors to a high risk of liability. The concerns behind the immunity defense are especially salient in the context of street-level police work, which frequently requires quick and decisive action in the face of volatile and changing circumstances. The law thus shields police officers from civil liability unless the officer reasonably should have known that his actions violated clearly established constitutional rights.

*Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994) (citations omitted); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (citation omitted).

A right is clearly established if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 7, 11 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). Also, the inquiry into whether a right is clearly established must "be undertaken in light of the specific context of the case" and "not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 194–95 (2001). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* at 195.

At the time of this incident in 2020, there was no clearly established rule prohibiting the Officers from acting as they did. Even putting aside that *Santana* authorized the Officers to pursue Francis into the house upon having probable cause to believe he had committed the felony of assaulting a police officer, whether a law enforcement officer had "categorical" authority to pursue a misdemeanor suspect who had fled into a home was uncertain, at least up to 2021. *See Lange*, 594 U.S. at 300. ("Courts are divided over whether the Fourth Amendment always permits an officer to enter a home without a warrant in pursuit of a fleeing misdemeanor suspect. Some courts have adopted such a categorical rule, while others have required a case-specific showing of exigency."). In *Lange*, the Supreme Court chose the case-specific rather than the categorical approach, but specifically acknowledged that, "'the law regarding warrantless entry in hot pursuit of a fleeing misdemeanant is not clearly established' (so that the officer could not be held liable for damages)." 594 U.S. at 304–05 ("In other words, we found that neither *Santana* nor any other decision had resolved the matter one way or the other. And we left things in that unsettled state." (discussing the 2013 case *Stanton v. Sims*, 571 U.S. at 10). As discussed above, Scott had probable cause to pursue Francis at least for the misdemeanor of speeding and to question him about DWI. Therefore, a reasonable officer in Scott's and Lang's positions in October 2020 would not have clearly known that pursuing Francis into the garage and then further into the house to arrest him was unlawful conduct (which, of course, the Court finds was not unlawful even after *Lange*).[12]

_____

[12] Plaintiff argues that *Payton v. New York* "clearly established" that the Officers' conduct violated the Fourth Amendment. Not so. In *Payton*, a criminal defendant indicted for murder challenged the constitutionality of New York statutes that authorized police officers to enter a private residence without a warrant and use force, if necessary, to make a routine felony arrest. *See Payton v. New York*, 445 U.S. 573, 574 (1980). Therefore, the relevant circumstances related to the scope of police authority to pursue a suspect and enter a home that are at issue here (and in later cases such as *Santana* and *Lange*) were not addressed in *Payton*. So, *Payton* does not establish ("clearly" or otherwise) any constitutional rule that would govern the specific circumstances of this case.

15

Therefore, the Court concludes that the Officers have qualified immunity from liability under Section 1983 for their entry into Francis' home.

### 2. Alleged Excessive Force in Violation of the Fourth Amendment

Plaintiff's second Section 1983 claim is that the Officers violated his Fourth Amendment rights because they used excessive force during his arrest. "[A]ll claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). *Allen v. City of Dunn*, 708 F. Supp. 3d 743, 753 (E.D.N.C. 2023). "[P]olice officers are constitutionally permitted to use only that force which is reasonable under the circumstances." *Hupp*, 931 F.3d at 321. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *see also Kingsley v. Hendrickson*, 576 U.S. 389, 399 (2015) ("[A] court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer"); *Saucier*, 533 U.S. at 207 ("Excessive force claims ... are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred"), *abrogated on other grounds* by *Pearson*, 555 U.S. at 223.

"The court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996). Under *Graham*, courts consider the following factors: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396 . But these factors are not "exclusive," and courts may identify

16

other "objective circumstances potentially relevant to a determination of excessive force." *Kingsley*, 576 U.S. at 397. For example, the Court may consider "[t]he relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; [and] any effort made by the officer to temper or to limit the amount of force." *Id*. "Ultimately, [the court] must decide whether the totality of the circumstances justifie[d] a particular sort of ... seizure." *Hupp*, 931 F.3d at 322.

First, with respect to Officer Scott, it is unnecessary to discuss a full *Graham* analysis. She is entitled to summary judgment on Plaintiff's claim of the use of "excessive force" in his arrest because the BWC clearly establishes that her only involvement in Francis' arrest in his bedroom is lightly assisting for a few seconds while Lang handcuffed him. *See* Lang BWC at 2:47-2:53. Further, the BWC reflects that Lang's takedown of Francis occurred several feet in front of her and just seconds after Lang entered Francis' bedroom. Therefore, she did not have a reasonable opportunity to prevent Lang's alleged unlawful conduct so she also cannot be liable as a "bystander." *See Randall v. Prince George's Cnty., Md*., 302 F.3d 188, 204 (4th Cir. 2002).

Sergeant Lang is the officer whose conduct is most at issue. Considering the "totality of the circumstances," the Court finds that the manner in which he arrested Francis was not objectively unreasonable, even though Francis was unfortunately injured in the process. *See Wilson v. Flynn*, 429 F.3d 465, 469 (4th Cir. 2005) (rejecting excessive force claim of intoxicated suspect whose face was badly bruised and swollen in addition to a broken nose); *Stainback v. Dixon*, 569 F.3d 767, 773 n.7 (7th Cir. 2009) ("evidence of the seriousness of [plaintiff's] injury alone, without evidence of an objectively unreasonable act, cannot create a genuine issue of fact as to whether the Officers' actions were reasonable").

17

As he was driving to the house and in the tense moments between his arrival, the search for Francis and Francis' arrest, Lang was told that Francis was very drunk and had (successfully) fought with Scott to avoid arrest. Only approximately 45 seconds elapsed from the time Lang came into the garage, found Francis upstairs, took him to the floor and began handcuffing him. *See* Lang BWC at 1:36 – 2:17. When he came upon Francis in the bathroom, Lang holstered his gun, grabbed Francis and with an "armbar" maneuver[13] forced him to the ground in the bedroom just outside the bathroom. The time between when Lang first saw Francis and when Francis was on the ground was less than five seconds. *Id*. at 2:10-2:14. Lang testified that he took this immediate action because he was concerned that, having already fought Scott, Francis would do the same with him, and Lang wanted to quickly take command of the situation. The Court finds this explanation to be reasonable based on what Lang knew at the time of the arrest.[14]

Also, as in *Wilson*, the Court finds it significant that the allegedly excessive force used against Francis ceased after the Officers handcuffed him. *See Wilson*, 429 F.3d at 468–69 ("As the district court noted, '[t]his fact supports the finding that the force used by the officers was that

---

[13] As discussed above, Lang testified (without contradiction) that he had used this armbar technique many times and seen it used by others without injury to the suspect. *See Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019) ("Any takedown can go awry—some suspects fall clumsily, while others have fragile bones— but, if the officers use steps reasonably likely to effect a clean takedown, an injury does not lead to liability.").

[14] Of course, Lang had other options. For example, he could have remained in the bedroom with his gun on Francis and ordered Francis to come out with his hands up and get on the floor. While this might have avoided Plaintiff's injuries—if Francis had cooperated—this option carried far more risk to both Francis (if he made a wrong move and was shot) and Lang (if Francis attacked him). In any event, Lang's snap decision to employ the armbar need not have been—in hindsight—the best option, or even the least forceful option available. *See, e.g.*, *Forrester v. City of San Diego*, 25 F.3d 804, 807-08 (9th Cir. 1994) ("Police officers, however, are not required to use the least intrusive degree of force possible."); *Stevenson v. City of Albuquerque*, 446 F.Supp.3d 806, 858 (D.N.M. 2020) ("To avoid a 'Monday morning quarterback' approach, the Fourth Amendment does not require the use of the least, or even a less, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable under *Graham v. Connor*.").

force which was necessary to effect the arrest of an aggressive individual in a rapidly changing environment.'"). Indeed, after walking Francis to the driveway, Lang promptly gave him medical care and then rearranged his handcuffs to be more comfortable. This behavior is inconsistent with any desire to deliberately hurt Francis. Accordingly, "the totality of the circumstances" demonstrates that Francis has failed to establish that the Officers' use of force was constitutionally unreasonable. *See, e.g.*, *Vera v. Rodriguez*, 2018 WL 327236, at *7 (D.N.M. 2018) (agreeing "that a warning was not required where an officer could reasonably believe that plaintiff's previous actions clearly evidenced a disregard for police authority and could result in . . . force being used against him"); *Perkinson v. White*, 2015 WL 333012, at *4 (E.D.N.C. 2015) ("[It] is not per se excessive force when a police officer fails to warn a suspect before deploying pepper spray."); *Jalloh v. Underwood*, 464 F.Supp.3d 125, 129 (D.D.C. 2020) (upholding arresting officer's decision to "fling" assault suspect to ground where suspect's prior assault on other officer made it "reasonable for Officer Anderson to assume that Jalloh might flee, resist, or try to injure the officers, and to take appropriate precautions"). Because Francis has not proven a constitutional violation, the Officers are entitled to summary judgment on Francis' Section 1983 claim based on excessive force.

Finally, as with the claim based on unlawful entry, Francis has not shown that the Officers are not entitled to qualified immunity. The Fourth Circuit has applied *Graham* in many cases, none of which would have given notice to the Officers that their conduct here would violate "clearly established law." The application of *Graham* to these circumstances was therefore, at least, uncertain. As a result, the Officers are entitled to qualified immunity, even if it were found that they committed a constitutional violation (which the Court does not find for the reasons stated

19

above). *See Morgan v. City of Charlotte*, No. 322CV00003KDBDCK, 2023 WL 4002524, at *11–12 (W.D.N.C. June 14, 2023).

### B. Claims under North Carolina Law – Public Official Immunity

Along with their defenses on the merits, the Officers argue that they are subject to public officials' immunity as to Plaintiff's state-law claims for assault and battery and trespass to realty. The Court agrees. Under North Carolina law, "a public official, engaged in the performance of governmental duties involving the exercise of judgment and discretion, may not be held personally liable for mere negligence in respect thereto." *Smith v. State*, 289 N.C. 303, 331 (1976) (quoting *Smith v. Hefner*, 235 N.C. 1, 7 (1952)). This immunity has been recognized at common law for over a century. *See Epps v. Duke Univ., Inc.*, 122 N.C. App. 198, 202, 468 S.E.2d 850 (1996). North Carolina courts have found police officers engaged in performance of their duties are public officials entitled to public official immunity. *Campbell v. Anderson*, 156 N.C. App. 371, 376, (2003).

That said, public official immunity is not absolute. Public officials' actions are not shielded if their actions were "(1) outside the scope of official authority, (2) done with malice, or (3) corrupt." *Wilcox v. City of Asheville, et al.*, 222 N.C. App. 285, 288, 730 S.E.2d 226, 230 (2012). For that reason, it "is unavailable to officers who violate clearly established rights because an officer acts with malice when he does that which a man of reasonable intelligence would know to be contrary to his duty." *Hensley v. Price*, 876 F.3d 573, 587 (4th Cir. 2017). There is no allegation that the Officers acted outside the scope of their authority or corruptly, and so whether the Officers are entitled to public official immunity turns on whether they acted with malice.

The only argument that Plaintiff has advanced to show malice on the Officers' part is that they engaged in excessive force. Having already found that the Officers did not use excessive

20

force, they consequently did not act with the malice required to pierce the shield of public official immunity. Nor is there any evidence before the Court to indicate that the Officers otherwise acted in bad faith. *See Leete v. Cty. of Warren*, 341 N.C. 116, 119 (1995) ("[i]t is well settled that absent evidence to the contrary, it will always be presumed 'that public officials will discharge their duties in good faith and exercise their powers in accord with the spirit and purpose of the law.'") The Court finds therefore that the Officers are entitled to public official immunity.

### C. Plaintiff's Remaining Claims

Plaintiff's remaining claims are Assault and Battery and Negligence. Defendants are entitled to summary judgment on both claims.

#### 1. Assault and Battery

Plaintiff's claims for assault and battery are governed by the same law as his federal claim under the Fourth Amendment. *Njang v. Montgomery Cnty., Maryland*, 279 F. App'x 209, 216 (4th Cir. 2008) ("The jurisprudence governing Fourth Amendment excessive force actions also controls a party's actions for battery and gross negligence."). Thus, state law tort claims that are premised on an officer's use of force which is found to be reasonable and not excessive under the circumstances are not actionable under North Carolina law. *See Heavner*, WL 17477561, at *3–8; *Glenn-Robinson v. Acker*, 140 N.C. App. 606, 625 (2000); *Bell v. Dawson*, 144 F. Supp.2d 454, 464 (W.D.N.C. 2001); *Wilcoxson v. Painter*, 2016 WL 866327, *10 (E.D.N.C. March 3, 2016) ("[w]here a law enforcement officer's use of force was reasonable for the purposes of finding qualified immunity to a § 1983 excessive force claim, it is fatal to the Plaintiff's state law tort claims."). As discussed above, the Officers' objectively reasonable use of force defeats Plaintiff's Fourth Amendment excessive force claims; accordingly, Plaintiff's claims for assault and battery fail as well.

### 2. Negligence

The Second Cause of Action seeks to hold the Officers liable for negligence in their official capacities, for both the warrantless entry into the house, and Francis' injuries resulting from the use of force. The claim also names the Town as a defendant on the basis of respondeat superior. *See* Doc. 1 at ¶ 107. Claims of negligence of course depend on evidence of a breach of duty. *See Finley Forest Condo. Ass'n v. Perry*, 163 N.C.App. 735, 739 (2004) ("In tort, no liability exists unless the law imposes a duty."). As discussed at length above, Francis has not established that the Officers breached any constitutional or other duty in entering the house and effecting his arrest. To the contrary, the Court holds they were doing their duty. Therefore, the Officers are entitled to summary judgment on Plaintiff's negligence claims.

Plaintiff also seeks to hold the Town of Mint Hill liable on a theory of respondeat superior. Because the Town's agents are not liable for negligence then no vicarious liability arises and the Town is similarly entitled to summary judgment on that claim.

## IV.    ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendants' Motion for Summary Judgment (Doc. No. 21) is **GRANTED**;

2. Scott's Counterclaim against Francis is **DISMISSED** in accordance with her stipulation of dismissal. *See* Doc. No. 22 at 1, n.1; and

3. The Clerk is directed to close this matter in accordance with this Order.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: April 21, 2025

Kenneth D. Bell
United States District Judge